## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MAXIMO GOMEZ,

     Plaintiff,

v.                            Case No.  3:20-cv-253-BJD-MCR

CAPT. LISTER, et al.,

     Defendants.

_____

## **ORDER**

### I. **Status**

Plaintiff, an inmate of the Florida penal system, filed a Civil Rights Complaint (Doc. 1; Complaint) against five Defendants: Captain Steven W. Lister, Captain Jason Carter, Sergeant Slater Williams, Sergeant Anthony McCray, and Nurse Jalenah Stormant.[1] Plaintiff sues each Defendant in their individual and official capacities. Id. at 2-4. As relief, he requests compensatory damages of $50,000 against each Defendant; punitive damages of $90,000 against each Defendant; additional compensatory damages of $38,000 against

---

[1] Throughout his Complaint, Plaintiff identifies Defendant Stormant as "Jalena McElwain." See generally Doc. 1. But in her Motion to Dismiss, she clarifies that her name is now "Jalenah Stormant." See Doc. 25 at 1 n.1. Thus, the Court directed the Clerk to correct Jalenah Stormant's name in the docket caption. See Doc. 51 at 1 n.1.

only Defendants S. Williams and McCray; declaratory relief; and any other relief that the Court deems just and proper. Id. at 6.

Before the Court are (1) Defendants McCray, Carter, S. Williams, and Lister's Motion for Summary Judgment (Doc. 63), with exhibits (Docs. 63-1 through 63-13); (2) Defendant Stormant's Motion for Summary Judgment (Doc. 62), with exhibits (Docs. 62-1 through 62-5; Doc. 68-1); and (3) Plaintiff's Motion for Summary Judgment (Doc. 58), with exhibits (Docs. 58-1 through 58-3). Defendants filed responses to Plaintiff's Motion (Doc. 59; Doc. 72). And Plaintiff filed responses to Defendants' motions (Doc. 66; Doc. 74). These Motions are ripe for review.

## II. <u>Standard of Review</u>

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9

F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation

marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). In cases involving video evidence, the Court will accept the video's depiction of the events if the video "obviously contradicts" the opposing party's version of events. See Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010); see also Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013) (recognizing that "where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"). "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the [the non-movant's] version of

what happened." <u>Shaw v. City of Selma</u>, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

When a court is presented with cross motions for summary judgment, the court must evaluate each motion separately to determine whether either party is entitled to the relief sought in their respective motions. In accordance with Rule 56, when evaluating the merits of each motion, the court must construe the facts in the light most favorable to the non-moving party. <u>See</u> 10A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2720 (4th ed. 2018) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.").

### III. <u>Plaintiff's Complaint</u>

In his Complaint, Plaintiff alleges that on October 8, 2017, while housed at Hamilton Correctional Institution, he advised Sergeant Chamele James that he was feeling extremely depressed and had a psychological emergency. Doc. 1 at 13. Sergeant James escorted Plaintiff to Defendant Stormant, the facility's nurse, for a mental health evaluation. <u>Id.</u> at 14. According to Plaintiff, during his mental health assessment, Defendant Lister told Defendant Stormant "not to honor Plaintiff's psychological emergency []or place him in a[n] observation cell because he want[ed] to spray Plaintiff with chemical agents." <u>Id.</u> Plaintiff contends that Defendant Lister contacted "Warden

5

Anderson for authorization to use force while Plaintiff [was] still being evaluated for his psychological emergency." Id. He states that at Defendant Lister's request, Defendant Stormant "intentionally refuse[d] to give Plaintiff any further [] medical treatment and dishonor[ed] Plaintiff's psychological emergency as a management problem . . . ." Id.

Plaintiff states that "[u]pon the completion of Defendant [Stormant's] mental health assessment, Plaintiff [] l[ie] prone on the floor outside the medical triage room," and when he began yelling that he needed help and felt suicidal, Officers Anthony Stebbins, Jeffery Taylor, Nathan Williams, and Marvin Norman carried Plaintiff to a confinement cell. Id. at 15. According to Plaintiff, once in his confinement cell, Defendant Lister directed Officer Norman to administer one application of chemical agents. Id. He alleges that officers then escorted him to a decontamination shower and when he again began yelling that he needed help and felt suicidal, Defendant Lister ordered Officer Norman to administer a second application of chemical agents into the shower cell. Id. at 16. Plaintiff explains that Defendant Lister then ordered a third application of chemical agents; and, because Plaintiff continued to yell that he was suicidal, Defendant Carter ordered a cell extraction team to restrain Plaintiff. Id. at 17-18.

According to Plaintiff, he was preparing to submit to hand restraints at Defendant Carter's request, but Defendant Carter ignored Plaintiff and

ordered the cell extraction team, which included Defendants McCray and S. Williams, to enter Plaintiff's shower cell. Id. at 18. Upon entry, Plaintiff alleges Defendant McCray hit him with a plastic shield, knocking Plaintiff to the ground, and punched him in the facial area. Id. Plaintiff asserts Defendant S. Williams also kicked Plaintiff repeatedly in the face and body. Id. According to Plaintiff, Defendants Carter and Lister failed to intervene and stop McCray's and S. Williams's physical attack on Plaintiff. Id. at 19.

According to Plaintiff, he was then taken to Defendant Stormant for a post-use-of-force evaluation. Id. at 21. He alleges that he advised Defendant Stormant that "he was in a lot of pain and felt dizziness due to his left side of head being swollen" and explained he could not see out of his left eye. Id. at 22. Plaintiff states that "[a]t this time Defendant [] Carter [told] Defendant [Stormant] not to provide Plaintiff with any more medical treatment," telling her, "[i]f he is not dying I am put[ting] him back in his cell." Id. at 22. Plaintiff states Defendant Stormant then "refuse[d] to give Plaintiff any more medical treatment, despite seeing that Plaintiff [] had suffered and was suffering from his injuries"; and he was sent back to his cell. Id. According to Plaintiff, about one hour after returning to his cell, Sergeant Coty Wiltgen found Plaintiff on the floor, unresponsive, and drenched in blood "due to his head injuries." Id. Plaintiff was rushed to medical and then sent to an outside hospital for treatment.

As a result of Defendants' actions, Plaintiff alleges he suffered multiple abrasions to his back, a swollen left ear, a facial laceration about 3 cm x 0.5 cm that required stitches, head trauma, a contusion to left hand, permanent eye damage to his left eye for which Plaintiff now requires eyeglasses to see, headaches, dizziness, and bleeding. Id. at 19-21.

Based on these allegations, the Court construes Plaintiff's Complaint as raising several constitutional claims, the following of which remain[2]: (1) Defendant Lister acted deliberately indifferent to Plaintiff's psychological emergency; (2) Defendant Lister's use of chemical agents violated Plaintiff's Eighth Amendment rights; (3) Defendant Carter and Defendant Lister failed to intervene during the use of excessive physical force; (4) Defendants McCray and S. Williams used excessive physical force during Plaintiff's cell extraction; and (5) Defendant Carter and Defendant Stormant were deliberately

---

[2] The Court dismissed with prejudice Plaintiff's claim that Defendant Stormant acted deliberately indifferent to his psychological emergency before the use of force, and it dismissed with prejudice all claims for monetary damages against Stormant in her official capacity. See Order (Doc. 51).

indifferent to Plaintiff's serious medical needs following the use of physical force.[3]

## IV. <u>Analysis</u>

### A. Defendants McCray, Carter, S. Williams, and Lister's Motion

In their Motion, Defendants McCray, Carter, S. Williams, and Lister argue they are entitled to summary judgment because: (1) Plaintiff has failed to establish a constitutional violation against Defendants in their individual capacities; (2) Plaintiff is not entitled to damages against Defendants in their official capacities; (3) Plaintiff's request for declaratory relief is moot; and (4) Defendants are entitled to qualified immunity.[4] <u>See generally</u> Doc. 63. In support of their Motion, Defendants filed these exhibits: declarations of Defendants Lister, S. Williams, Carter, and McCray (Docs. 63-1 through 63-4);

---

[3] When discussing his excessive force claims against Defendants McCray and S. Williams, Plaintiff makes a passing reference to "unlawful battery." Doc. 1 at 20. Also, when discussing his deliberate indifference claim against Defendant Stormant, he makes a passing reference to "conspiracy to falsify medical records." <u>Id.</u> at 23. Because he makes these references when discussing his constitutional claims for excessive physical force and deliberate indifference to a serious medical need, respectively, the Court considers these allegations when analyzing those constitutional claims rather than as additional, state law claims.

[4] Because the Court finds no constitutional violations occurred, the Court need not address Defendants' qualified immunity argument. Further, the Court need not address Plaintiff's official capacity or supervisory liability claims. <u>See</u> <u>Knight through Kerr v. Miami-Dade Cnty.</u>, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation."). And the Court need not address Plaintiff's request for declaratory relief.

several use of force reports (Docs. 63-5, 63-6); three disciplinary reports (Docs. 63-7 through 63-9); Florida Administrative Code r. 33-602.210 (Doc. 63-10); fixed wing and handheld video recordings of Plaintiff's mental health exam and a fixed wing video recording of the cell extraction (Doc. 63-11) under seal; a second fixed wing video recording of the cell extraction (Doc. 63-12) under seal; and Plaintiff's sworn Deposition (Doc. 63-13). The Court summarizes the relevant exhibits in chronological order.

According to a Disciplinary Report (log # 250-171567) charging Plaintiff with "Obscene Profane Act" (Doc. 63-9 at 1), at 5:15 p.m. on October 8, 2017, Officer T.M. Simpson was conducting a visual security check of d-dormitory when he "observed [Plaintiff] standing in the door way [sic] of the wing exit door stroking his [genitals] . . . while looking out the door directly at Officer S. Walgamotte." Doc. 63-7 at 1. The Report provides:

> The whole incident was captured on the everfoucus [sic] camera system in its entirety. I Immediately called for additional security and upon arrival [Plaintiff] was placed in wrist restraints and, escorted from the dorm with no further incident. Shift OIC was notified and authorized this report to be written, [Plaintiff] will be placed in administrative confinement pending disposition of this disciplinary report.

Id.

After the issuance of this DR, officers placed Plaintiff in a holding cell awaiting placement in confinement. Defendant Lister first encountered

Plaintiff while he was in the holding cell. Lister describes his interaction as follows:

> [A]t approximately 6:28 p.m., I summoned Captain Norman to Wing I of H-Dormitory in reference to a disruptive Inmate. Upon his arrival, I advised Captain Norman that Inmate Gomez, Maximo [], who was in the holding cell of wing, was disrupting the confinement unit by repeatedly refusing to submit to hand restraints, yelling obscenities towards staff and refusing to comply with repeated orders.
>
> Medical and Security staff had attempted to utilize Crisis Intervention Techniques to resolve the situation and gain compliance from Inmate Gomez. Inmate Gomez reluctantly complied with orders to submit to hand-restraints and was escorted to the H-Dormitory Medical Triage room due to him declaring a psychological emergency. Upon the completion of Inmate Gomez's mental health assessment, Inmate Gomez laid prone on the floor and refused to be escorted to his cell. It was at this time that Sergeant Anthony Stebbins, Officer Jeffery Taylor, Officer Nathan Williams, and Sgt. Norman utilized a four man carry of inmate Gomez to cell H3101. Upon be[ing] placed in the cell, Inmate Gomez refused to submit to the removal of hand restraints and leg irons.
>
> At that time, Officer Nathan Williams, Officer Jeffery Taylor, Officer Marvin Norman, and Sgt. Anthony Stebbins attempted to place inmate GOMEZ's hand back in the flap of the cell door. Inmate Gomez secured the flap with both arms outside the cell door. Inmate Gomez became combative and disorderly refusing all orders to submit to hand restraint removal. All officers involved backed out of the cell. Inmate Gomez secured the handcuffing port with both arms outside the cell door. At approximately 6:30 p.m., I directed Sergeant Norman to administer One (01) application of chemical agent into cell H3101, through

the hand cuff port of the cell. At approximately 6:38 p.m. Inmate Gomez complied with all orders to submit to hand restraints [and] was removed to cell #1 for decontamination. After decontamination shower inmate Gomez continued his tirade, and again refused to submit to hand restraints.

At approximately 6:51 p.m., under my direct supervision, Sgt. Norman administered a Second application of (OC) Oleoresin Capsicum chemical agent consisting of (3) three, (1) one second bursts from MK-9 Fogger #75-7 into the shower cell door. Subsequent to the second application of chemical agent, Inmate Gomez continued to refuse all orders, At approximately 7:06PM. and under my direct supervision, Sgt Norman administered one application of (OC) Oleoresin Capsicum chemical agent consisting of (3) three (1) one second bursts from MK-9 Fogger #74-8 into the shower cell through the shower cell door. Inmate Gomez continued his verbal tirade and again refused to submit to wrist restraints. Following the third application of chemical agents all force ceased by Sgt. Norman.

[ ] Inmate GOMEZ's behavior could have posed serious injury towards security staff. Due to Inmate GOMEZ's continued disorderly behavior, authorization for a Forced Cell Extraction was obtained and a Cell extraction team was assembled. Captain Jason Carter advised Inmate GOMEZ that a forced cell extraction would be utilized to gain his compliance should he refuse to comply with orders given. Inmate GOMEZ initially stated that he would submit to wrist restraints [ ] and turned his back to the shower door. Subsequently, Inmate GOMEZ refused to comply as he resumed his disruptive behavior while turning around yelling towards staff as he extended his arms upward. As a result of Inmate GOMEZ'S continued physical resistance to lawful command, the cell extraction team was ordered to

> breach wing III Decontamination Shower #1 and restrain Inmate GOMEZ.
>
> I witnessed the use of [force] and used only the minimum amount of force necessary to bring Inmate Gomez into compliance with a lawful order.
>
> Inmate Gomez received two disciplinary reports one for a violation of Florida Administrative Code 66-601.301 (6-1) Disobeying a Verbal Order and (2-3) Participating in a disturbance as a result of his actions throughout the uses for force incidents.
>
> . . . .

Doc. 63-1 at 1 (paragraph enumeration omitted).[5] In his Incident Report, Lister states that the use of force "was necessitated to quell the disturbance being created by Inmate Gomez within the confinement unit." Doc. 63-5 at 9-10. And that Plaintiff "compiled his manipulation skills with years of incarceration experience in an attempt to control the actions of the security staff involved." Id. at 10. Warden Tony Anderson's Authorization for Use of Force report provides that Lister contacted Anderson about Plaintiff refusing all orders given and refusing to remove his arms from the handcuffing port. Doc. 63-5. Anderson authorized the use of OC chemical agents should the use of force be

---

[5] In his Declaration, Defendant Lister erroneously states that Plaintiff had on wrist restraints while in the decontamination shower and the cell extraction team was called because he was refusing to submit to wrist restraint removal. A review of his incident report, the video evidence, and other officers' statements shows that Lister clearly confuses the facts about Plaintiff in the confinement cell and the decontamination shower, and thus the Court omitted the confusing statements from his Declaration for clarity.

required. Id. Anderson then authorized the use of a third application of OC chemical agents because of Plaintiff's continued disruption within the confinement unit. Id.

In their incident reports, Officer Jeffery Taylor (id. at 11), Sergeant Anthony Stebbins (id. at 13), and Officer Nathan Williams (id. at 15) stated that following Plaintiff's psychological evaluation, Plaintiff lay in a prone position on the floor and refused to be escorted back to his cell, and thus they participated in a four man carry of Plaintiff to place him in his cell. They then explained the events immediately preceding the use of chemical agents:

> Upon inmate GOMEZ'S placement in the [confinement] cell he refused to submit to the removal of hand restraints and leg irons. At this time[, Stebbins, Taylor, Lister, and N. Williams] attempted to place inmate GOMEZ'S hand back in the flap of the cell door. Inmate Gomez secured the flap with both arms outside the cell door. The organized utilization of chemical agents was necessary to bring Inmate GOMEZ [] into compliance to a lawful command.

Doc. 63-5 at 11-15.

In his Incident Report, Sergeant Marvin Norman explained:

> [A]t approximately 6:28PM, I was summoned by Captain Steven W. Lister to Wing I of H-Dormitory in reference to a disruptive inmate. Upon my arrival, [] Lister advised me that Inmate Gomez [] who was in the holding cell of wing I was disrupting the confinement unit by repeatedly refusing to submit to hand restraints, yelling obscenities towards staff and refusing to comply with repeated orders. [Medical and] Security staff had attempted to utilize (CIT) Crisis

14

Intervention Techniques to resolve the situation and gain compliance from Inmate Gomez. Inmate Gomez reluctantly complied with orders to submit to hand restraints and was escorted to H-Dormitory [Medical Triage room due to him declaring a psychological emergency]. Upon the completion of inmate['s mental health assessment], Gomez laid prone on the floor and refused to be escorted to his cell. [I]t was at this time Sergeant Anthony Stebbins, Officer Jeffery Taylor, Officer Nathan Williams, and I utilized a four man carry of inmate Gomez to cell H3101. Upon placing inmate Gomez in the cell he refused to the removal of hand restraints and leg irons. . . . . Inmate Gomez secured the handcuffing port with both arms outside the cell door. At approximately 6:30PM under the direct supervision of Captain S. Lister I administered one application of (OC) Oleoresin Capsicum chemical agent consisting of (3) three, (1) one second bursts from MK-9 Fogger #75-7 into the cell, through the handcuffing port of the cell door. At approximately 6:38PM Inmate Gomez complied with all orders to submit to hand restraints and was removed to Shower cell #1 for decontamination. After decontamination shower inmate Gomez continued his tirade, and again refused to submit to hand restraints. At approximately 6:51PM, under the direct supervision of Captain S. Lister, I administered a Second application of (OC) Oleoresin Capsicum chemical agent consisting of (3) three, (1) one second bursts from MK-9 Fogger #75-7 into the shower cell door. Subsequent to the second application of chemical agent, Inmate Gomez continued to refuse all orders, At approximately 7:06PM. and under the direct supervision of Captain S. Lister, I administered one application of (OC) Oleoresin Capsicum chemical agent consisting of (3) three, (1) one second bursts from MK-9 Fogger #74-8 into the shower cell, through the shower cell door. Inmate Gomez continued his verbal tirade and again refused to submit to wrist restraints. Following the third application of chemical agents all force ceased by me. I am certified in the use of chemical agents as

>    indicated on my firearms card which expires October
>    2017.

Doc. 63-5 at 9-10. Based on these events, Officer Norman issued Disciplinary

Report (log # 250-171585) charging Plaintiff with "Disobeying a Verbal or

Written Order" for Plaintiff's refusal to stand and be escorted back to his cell

following his mental health evaluation, resulting in the use of a four man carry.

Doc. 63-9.

    According to Warden Anderson's Authorization for Use of Force, after

the uses of chemical agents he "was contacted by [] Lister and authorized the

utilization of a certified forced cell extraction team if necessary to overcome

[Plaintiff's] physical resistance to lawful commands and to remove [Plaintiff]

from the shower stall. . . ." Id.

    In his Declaration, Defendant Carter described that following the uses

of chemical agents, he tried to counsel Plaintiff to submit to wrist restraints

for removal from the shower cell. Doc. 63-3 at 1-2. Defendant Carter ultimately

ordered the cell extraction team:

>    On October 8, 2017, at approximately 7:33 p.m.,
>    while assigned as Main Unit A's shift supervisor, I was
>    present on wing three of H-Dormitory and issued
>    Inmate Gomez, Maximo [], a final order to submit to
>    hand restraints so that he could be removed from the
>    decontamination shower and a Post Use of Force
>    medical assessment. I further advised Inmate Gomez
>    that a forced cell extraction would be utilized to gain
>    his compliance should he refuse to comply with orders
>    given. Inmate Gomez initially stated that he would

16

submit to wrist restraints and turned his back to the shower door. Subsequently, Inmate Gomez refused to comply as he resumed his disruptive behavior while turning around yelling towards staff as he extended his arms upward.

As a result of inmate Gomez's continued resistance to lawful commands, I ordered the cell extraction team to breach Wing 3's Decontamination Shower #1 to restrain Inmate Gomez. Upon Inmate Gomez being restrained by the cell extraction [t]eam members, he was assisted to a standing position and removed from the decontamination shower and escorted to the H-dormitory Medical Triage Room where he received a Post Use of Force medical assessment by on-duty medical staff. Subsequently, Inmate Gomez was secured in H-3101 without incident.

I witnessed only the minimum amount of force necessary for the cell extraction team to overcome Inmate Gomez's physical resistance to lawful commands.

. . . .

Doc. 63-3 at 1-2 (paragraph enumeration omitted). Defendant Carter's Incident Report reiterates his Declaration and lists the five members of the cell extraction team: Defendant McCray, Defendant S. Williams, Sergeant Christopher Flanagan, Sergeant Joshua Trimble, and Officer Daniel Agnew. Doc. 63-5 at 29.

In their declarations, Defendants S. Williams and McCray described their participation in the cell extraction team. See Docs. 63-2, 63-4. Defendant McCray stated:

17

On October 8, 2017, at approximately 7:34 p.m., while assigned as the Cell Extraction Team Member #1, I was assigned to utilize the convex shield to immobilize inmate Gomez and to pin inmate Gomez to the cell wall or cell floor. I entered shower one on Wing three of Hotel Dorm and pinned inmate Gomez to the shower floor. I then assisted in applying wrist restraints as inmate Gomez was being physically resistant. Inmate Gomez was fully restrained. I assisted in bringing Inmate Gomez to a standing position and all force ceased by me. I then later assisted Sergeant Slater Williams with escorting inmate Gomez.

I only utilized and witnessed the use of the least amount of force necessary to gain compliance from Inmate Gomez during this incident.

Doc. 63-4 (paragraph enumeration omitted). Defendant McCray's Incident

Report reiterates his Declaration. See Doc. 63-5 at 17. According to Defendant

S. Williams:

On October 8, 2017, at approximately 7:34 p.m., while assigned as the Cell Extraction Team Member #2, I was assigned to restrain Inmate Gomez's upper extremities. I accomplished this by securing a hold of inmate Gomez's right hand with Sergeant Anthony McCray obtaining a hold to inmate Gomez's left hand. Once Inmate Gomez was correctly restrained, I maintained control of Inmate Gomez until he was assisted to a standing position. No additional force was necessitated during this use of force incident. I then exited the shower and all force ceased by me.

. . . .

I only utilized and witnessed the use of the least amount of force necessary to gain compliance from Inmate Gomez during this incident.

18

Doc. 63-2 (paragraph enumeration omitted). Defendant S. Williams's Incident Report reiterates his Declaration. See Doc. 63-5 at 19.

Following the uses of force, Officer Norman issued a third Disciplinary Report (log # 250-171584) charging Plaintiff with "Creating a Minor Disturbance" for "yelling to other inmates on the wing, and holding the handcuffing port hostage," as well as "continuous refusals to submit to wrist restraints," resulting in the use of chemical agents and cell extraction. Doc. 63-8. Later, Plaintiff entered a plea of guilty to Disciplinary Report (log # 250-171567) for "Obscene or Profane Act"; and was found guilty of Disciplinary Report (log # 250-171584) for "Creating a Minor Disturbance" and Disciplinary Report (log # 250-171585) for "Disobeying a Verbal or Written Order." See Docs. 63-7 through 63-9.

Handheld video evidence begins at 5:57 p.m. with Officer James addressing the camera and stating Plaintiff is refusing to submit to hand restraints to move him to another location. Doc. 63-11. Plaintiff is seen sitting in a holding cell behind Officer James. Id. As James is speaking to the camera, Plaintiff begins yelling that he has a psychological emergency, feels suicidal and homicidal, is being sexually harassed and experiencing retaliation, and will refuse to submit to hand restraints. Id. James walks out of the camera's view, and Plaintiff stops yelling and sits down. Id. Plaintiff sits quietly for

about ten minutes. Lister and three other officers approach Plaintiff's holding cell, and Lister and Plaintiff calmly speak to each other although the substance of their conversation is not audible. Id. Lister then addresses the camera and states that Plaintiff is refusing to submit to hand restraints to be escorted to medical and that Plaintiff has been provided a verbal warning to submit to restraints. Id. Three officers then approach Plaintiff and Plaintiff turns around and offers his hands through the cuffing port and is handcuffed. The officers then escort Plaintiff without incident to medical for his psychological evaluation.

Lister is in the medical evaluation room with the nurse when Plaintiff arrives. The officers close the door of the evaluation room and through the window of the closed door, a nurse is seen speaking with Plaintiff as she takes Plaintiff's blood pressure. Plaintiff appears calm as he speaks to her. About six minutes later, Lister opens the door and Plaintiff is escorted out of the room. As he is walking out, Plaintiff looks at the camera and states he is "homicidal/suicidal" before calmly dropping to the ground and lying on his stomach. He then states he "needs to be seen by medical" because he "might hurt [himself]," and that he "is not being disorderly" and that officers are refusing medical care. Officers calmly place leg restraints on Plaintiff, advise him that he was just seen by medical, roll Plaintiff onto his back and carry him to a confinement cell where they lay him down on his stomach and try to

remove his leg restraints. Plaintiff begins to scream that one of the officers is trying to break his arm.

Once the leg restraints are removed, the officers stand Plaintiff up and try to exit the cell, so they can remove Plaintiff's handcuffs through the cell door flap once the cell door is closed. Plaintiff noticeably resists as the officers back out of the cell and shut the cell door. Once the cell door is shut, Lister orders Plaintiff to put his hands through the handcuff flap, so his hand restraints can be removed. Plaintiff is heard incoherently screaming. Lister then addresses the camera and states that Plaintiff is refusing all verbal orders to submit to hand restraint removal. As Lister is addressing the camera, other officers are able to remove Plaintiff's hand restraints and Lister turns back to the cell door to assist. Lister then issues more than eleven verbal orders for Plaintiff to "put his hands back" into the cell, so the flap can be closed. Plaintiff refuses all orders and is seen through the cell window screaming and banging his body on the glass.

Lister then steps away from the cell door, out of the camera's view, and Plaintiff's arm is seen fully hanging out of the flap as Plaintiff yells to the camera that his "hands are swollen" and asks for "help." Lister returns with Officer Norman, who is carrying a can of chemical agents. Lister addresses the camera and again states that Plaintiff is refusing all verbal orders. While Plaintiff's arms and face are still hanging out of the handcuff flap, Lister

21

authorizes Officer Norman to administer chemical agents. Officer Norman then sprays two bursts of chemical agents into the flap, directly hitting Plaintiff's face. Plaintiff immediately retreats away from the flap opening and Lister states two verbal orders for Plaintiff to sit on his bunk. Plaintiff does not comply and is seen through the flap walking towards the cell door again and Officer Norman sprays another burst of chemical agents into the open flap. After the third burst of chemical agents, officers close the handcuff flap and walk out of the camera's view.

The first video recording then ends and at the beginning of the second recording, Lister advises that the initial camera's battery died, so officers replaced the battery and video was not being recorded for about 2 minutes. Through the cell door window, Plaintiff is seen shirtless, pacing in his cell, and knocking on the glass. Officers approach the door, open the flap, and Plaintiff submits to hand restraints. Officers escort Plaintiff out of the cell, place him in the decontamination shower cell, and remove his hand restraints without issue. The shower water is turned on and Plaintiff showers for several minutes.

Ten minutes into Plaintiff's decontamination shower, Lister approaches the shower cell and speaks to Plaintiff who begins yelling at Lister. Lister orders Plaintiff to stop yelling and get dressed. Plaintiff eventually begins getting dressed and when Lister and three other officers approach the shower cell to escort Plaintiff out, Plaintiff yells at the officers: "suck my d**k." Lister

turns and authorizes Norman to administer chemical agents. Norman then sprays three bursts of chemical agents into the shower cell, spraying Plaintiff in the face and head.

Plaintiff continues to yell incoherent statements and curse at the officers. Plaintiff also tries to communicate with other inmates in the wing, making hand gestures and attempting to catch glimpses into other confinement cells. The shower water is turned on and Plaintiff takes another decontamination shower. Plaintiff yells that the water is hot, and Lister responds that it is a cold-water shower and the gas is making Plaintiff feel hot. Lister eventually asks Plaintiff to put his shorts on and Plaintiff again refuses Lister's orders and begins cursing and yelling at Lister. Lister then authorizes Norman to administer another application of chemical agents and Norman sprays three bursts of chemical agents into the shower cell. Plaintiff immediately begins showering again while yelling "they are trying to kill me," requesting cold water, and other incoherent statements. Lister then addresses the camera, stating that officers double checked the water temperature and confirmed it is cold water.

A few minutes later, Lister asks Plaintiff if he will listen to orders for Plaintiff to "cuff up." Plaintiff ignores Lister's requests. Lister is heard stating that Plaintiff continues to refuse orders to submit to restraints. Lister orders Plaintiff to "cuff up" two more times and Plaintiff continues to ignore Lister's

directives. Lister asks Plaintiff to change out of his wet shorts and Plaintiff curses at Lister. Lister states to the camera that a cell extraction team is being assembled and makes a final order for Plaintiff to "cuff up." Plaintiff's response is not audible on the recording.

Lister walks away and then returns with a five-man cell extraction team marching behind him. The extraction team lines up outside Plaintiff's shower cell and Defendant Carter walks up to address Plaintiff. Carter and Plaintiff speak but the substance of their conversation is not audible. Plaintiff turns around and places his hands through the door flap seemingly submitting to hand restraints, but when Carter summons over an officer with handcuffs, Plaintiff turns to face Carter, lifts his arms in the air in an aggressive manner, and begins jumping up and down. Carter and Lister then open the cell door and the cell extraction team enters.

The first officer in line strikes Plaintiff with the shield and Plaintiff is knocked to the ground. Three members of the extraction team enter the cell while the other two stand in the cell door opening, and Carter and Lister stand outside of Plaintiff's cell. Officers repeatedly demand that Plaintiff "stop resisting." Thirty-three seconds after the cell extraction team enters, the shield is removed from the cell. A physical struggle or resistance between extraction team members and Plaintiff is seen, but because multiple officers are blocking the camera's view and since the events are occurring is such a narrow cell, the

24

Court cannot see the individual movements or actions of each officer or Plaintiff. No kicking or punching motions are visible. Also, once the cell extraction team breached the shower cell, the other inmates on the wing became increasingly loud, making banging noises and yelling. About two minutes after the cell extraction team enters, Plaintiff is in hand and leg restraints and officers stand Plaintiff up and escort him out of the shower cell to medical. When Plaintiff exits the cell, he has blood on his head and face. The video recording ends before Plaintiff enters the medical evaluation room.

**1. Deliberate Indifference to Plaintiff's Psychological Emergency**

Plaintiff claims that Defendant Lister acted deliberately indifferent to his psychological emergency in violation of his Eighth Amendment rights. Doc. 1 at 14. Defendant Lister argues he is entitled to summary judgment on this claim because Plaintiff has failed to show a constitutional violation. Doc. 63 at 15. First, Lister asserts Plaintiff declared his psychological emergency to merely avoid being placed in confinement following the issuance of his DR for obscene behavior. But even assuming Plaintiff had a serious medical need, Lister argues he did not act deliberately indifferent to that need because he escorted Plaintiff to medical where Stormant conducted a medical health assessment and deemed Plaintiff's complaints as a behavior management problem. Lister contends he was only relying on Stormant's professional assessment, and argues it is not deliberate indifference for non-medical

personnel to rely on information and direction provided by qualified medical professionals in carrying out their duties. Id. He also contends that the Court previously ruled that Plaintiff failed to state an Eighth Amendment claim against Stormant about these allegations, and thus that ruling applies equally to Plaintiff's claim against Lister. Id.

In his Response, Plaintiff reiterates the same allegations raised in his Complaint. Doc. 74-1 at 4. He contends that the "video evidence" shows he repeatedly advised Stormant that he "felt suicidal" and that Lister told Stormant not to honor Plaintiff's psychological emergency nor place him in an observation cell because Lister wanted to use chemical agents on Plaintiff. Id. According to Plaintiff, Stormant then followed Lister's order and refused to give Plaintiff medical care.

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). The Eleventh Circuit has explained:

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective

26

> knowledge of a risk of serious harm; (2) disregard of
> that risk; (3) by conduct that is more than [gross]
> negligence." <u>Townsend v. Jefferson Cnty.</u>, 601 F.3d
> 1152, 1158 (11th Cir. 2010) (alteration in original).
> The defendants must have been "aware of facts from
> which the inference could be drawn that a substantial
> risk of serious harm exist[ed]" and then actually draw
> that inference. <u>Farrow v. West</u>, 320 F.3d 1235, 1245
> (11th Cir. 2003) (quotation omitted).

<u>Easley v. Dep't of Corr.</u>, 590 F. App'x 860, 868 (11th Cir. 2014). "For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" <u>Nimmons v. Aviles</u>, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir.1991)); <u>see also</u> <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem).

In his Deposition, Plaintiff testified that he did not commit the offense alleged in Disciplinary Report (log # 250-171567), and that the issuance of the charge was one of the reasons he declared a psychological emergency that day. Doc. 63-13 at 22-23. His exchange with defense counsel is as follows:

> Q . . . I'm talking about this being one of the allegations
> that led to you being depressed, right? You say -- you
> say in [the Complaint] that you were depressed and
> you had suicidal behavior. Did it --

A Right, ma'am.

Q -- have the driving force behind it [that] you had been accused of something that you did not do, that --

A Yes, ma'am. That was -- that was one of the elements that I was really depressed about, yes. And what made me more depressed is they could have put me in handcuffs, told me not to stand outside the door, check the video camera, and then if the video camera was not showing me doing nothing like I know I wasn't doing, take the handcuffs off of me. You see what I'm saying. They didn't do that. You see what I'm saying. They ain't do that.

Id.

Plaintiff testified that following the issuance of this DR, he originally declared his psychological emergency during Nurse Fuller's pre-confinement assessment. Doc. 63-13 at 26. He explained that Nurse Fuller had the ability to order that Plaintiff be placed in an observation cell but Fuller advised officers to "let the nurse in confinement deal with it." Id. at 26-27. Plaintiff stated that later, Defendant Lister escorted Plaintiff to Defendant Stormant for a psychological evaluation. Plaintiff testified that during his psychological evaluation, Stormant "had the power to decide if [Plaintiff went] to the observation cell in medical or confinement," but she deemed Plaintiff's case a "management problem." Id. at 26. He also testified that Defendant Lister told Defendant Stormant "not to honor [Plaintiff's] psychological emergency, to not

place [Plaintiff] in the observation cell because he want[ed] to spray [Plaintiff] with chemical agents." Id. at 8.

The uncontested video evidence shows that while Plaintiff was in the holding cell awaiting his placement in confinement, Defendant Lister approached Plaintiff and spoke to Plaintiff before Lister calmly transported Plaintiff to medical for a mental health evaluation. Although the substance of their conversation cannot be heard, Plaintiff consulted Defendant Stormant for several minutes before she deemed Plaintiff's issue to be a behavioral/management problem. Plaintiff disagreed with the assessment, and as the door to the evaluation room opened, he immediately began declaring he was "homicidal/suicidal" and refused to be escorted to his confinement cell. Plaintiff alleges that Defendant Lister told Defendant Stormant not to honor Plaintiff's mental health assessment and that Lister had only one option – place Plaintiff in an observation cell – otherwise, Lister acted deliberately indifferent. But that allegation is contradicted by Plaintiff's Deposition testimony that Defendant Stormant "had the power to decide if [Plaintiff went] to the observation cell in medical or confinement" and Stormant deemed Plaintiff's issue a management problem, which influenced Carter's decision to place Plaintiff in confinement.

Defendant Lister's decision to escort Plaintiff to medical for a mental health evaluation upon his declaration of a phycological emergency shows

Defendant Lister did not "disregard" Plaintiff's "serious medical need." And his adherence to Defendant Stormant's medical opinion that Plaintiff's issue was behavioral does not amount to conduct that is more than gross negligence. Rather, it is a difference of opinion between Plaintiff and Defendant Lister, which fails to amount to a constitutional violation. Defendants' Motion is due to be granted on this claim.

## 2. Chemical Agents

Plaintiff claims that Defendant Lister ordered three uses of chemical agents because Plaintiff declared a psychological emergency, and thus the force was excessive in violation of his rights under the Eighth Amendment. Doc. 1 at 15-16. Lister claims he is entitled to summary judgment on this claim as the chemical agents were used to force Plaintiff's compliance after Plaintiff refused verbal orders, cursed at officers, and declined officers' efforts to remove or apply restraints. Id. Lister asserts that Warden Anderson authorized each use of chemical agents, and Lister contends he applied the number of chemical applications allowed under Florida Administrative Code rule 33-602.210(5) to obtain compliance. Id. But alas, the use of chemical agents failed, and Defendant Carter assembled the cell extraction team. Id.

In his Response, Plaintiff contends that the "video evidence" adequately depicts the uses of chemical agents. Doc. 74-1 at 5-6. Plaintiff alleges that Lister ordered the first use of chemical agents because Plaintiff was holding

the food port flap open and yelling for help, and then ordered the next administrations of chemical agents because Plaintiff was simply yelling at Lister about the water temperature during his decontamination shower. Id. at 5-6.

"In considering an Eighth Amendment excessive force claim, [the Court] [again] must consider both a subjective and objective component: (1) whether the 'officials act[ed] with a sufficiently culpable state of mind,' and (2) 'if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.'" Tate v. Rockford, 497 F. App'x 921, 923 (11th Cir. 2012) (per curiam) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)).

> In both Fourteenth and Eighth Amendment excessive force claims, whether the use of force violates an inmate's constitutional rights "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (establishing the standard for an Eighth Amendment excessive force claim); see Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) (applying the Whitley test in a Fourteenth Amendment excessive force case). If force is used "maliciously and sadistically for the very purpose of causing harm," then it necessarily shocks the conscience. See Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987) (stating that the Eighth and Fourteenth Amendments give equivalent protections against excessive force). If not, then it does not.

Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam). The

standard in an excessive use of force case is as follows:

> [O]ur core inquiry is "whether force was applied
> in a good-faith effort to maintain or restore discipline,
> or maliciously and sadistically to cause harm." Hudson
> v. McMillian, 503 U.S. 1, 112 In determining whether
> force was applied maliciously and sadistically, we look
> to five factors: "(1) the extent of injury; (2) the need for
> application of force; (3) the relationship between that
> need and the amount of force used; (4) any efforts
> made to temper the severity of a forceful response; and
> (5) the extent of the threat to the safety of staff and
> inmates[, as reasonably perceived by the responsible
> officials on the basis of facts known to them]. . . ."
> Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir.
> 1999) (quotations omitted). However, "[t]he Eighth
> Amendment's prohibition of cruel and unusual
> punishments necessarily excludes from constitutional
> recognition de minimis uses of physical force, provided
> that the use of force is not of a sort repugnant to the
> conscience of mankind." Hudson, 112 S.Ct. at 1000
> (quotations omitted).

McKinney v. Sheriff, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam).

"Although the extent of the injury is a relevant factor in determining the

amount of force applied, it is not solely determinative of an Eighth Amendment

claim." Muhammad v. Sapp, 494 F. App'x 953, 957 (11th Cir. 2012) (per curiam)

(citing Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)).

> When prison officials maliciously and
> sadistically use force to cause harm, contemporary
> standards of decency always are violated. See Whitley,
> supra, 475 U.S. at 327. This is true whether or not
> significant injury is evident. Otherwise, the Eighth
> Amendment would permit any physical punishment,

no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

Hudson, 503 U.S. at 9.

The Eleventh Circuit has also noted "that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement." Thomas v. Bryant, 614 F.3d 1288, 1311 (11th Cir. 2010) (citations omitted).

Applying the five excessive use of force factors to the conduct as depicted in the video evidence, the Court concludes that Plaintiff fails to establish, on the summary judgment record in this case, that Defendant Lister's use of chemical agents violated his Eighth Amendment rights. First, there is no evidence Plaintiff suffered physical injuries because of the use of chemical agents. Second, Defendant Lister reasonably perceived that he needed to use force given the circumstances apparent at the time. The undisputed evidence shows Plaintiff repeatedly and openly defied Lister's clear instructions and became increasingly threatening toward Lister and other officers. Before the first use of force, officers tried to take Plaintiff's hand restraints off as Plaintiff physically resisted their efforts. Once officers removed the handcuffs through the cell door flap, Plaintiff refused Defendant Lister's repeated orders to place

his arms back into the cell and defiantly used the full length of his arms to breach the opening while yelling obscenities at officers. After the first use of chemical agents, Plaintiff became compliant and allowed officers to escort him to the decontamination shower. But once in the shower, Plaintiff became more aggressive, refusing orders to get dressed, and yelling at the officers to "suck my d**k," prompting the second application of chemical agents. The second application caused Plaintiff to briefly cease his disorderly behavior. However, Plaintiff soon continued his unruly conduct and began yelling that the water was hot. Defendant Lister confirmed the water temperature was cold and asked Plaintiff to put his shorts on. Plaintiff again refused Lister's orders and began cursing and yelling at Lister, prompting Lister to order the third application of chemical agents. No further chemical agents were administered.

Third, the Court considers the relationship between the need for force and the amount of force used. Throughout the process, Plaintiff was afforded many opportunities to comply and seemingly did comply after the first use of chemical agents when he allowed officers to escort him to the decontamination shower without incident. But once in the decontamination shower, Plaintiff again became aggressive and threatening toward staff. He appeared to be communicating with other inmates, trying to increase the tension in the cell block. And his statements to officers became more obscene and violent. Despite facing Plaintiff's hostile behavior, Defendant Lister and the other officers

appeared calm and professional. The record also shows that Defendant Lister used only the number of chemical agents authorized under Florida Administrative Code r. 33-602.201(5).

Fourth, the Court considers officers' efforts to temper the severity of the forceful response. Before using chemical agents, Defendant Lister made numerous attempts to verbally counsel Plaintiff to gain his compliance. Before administering the first application, Defendant Lister issued more than eleven verbal orders for Plaintiff to "put his hands back" into the cell, so the food flap could be closed. Plaintiff refused all orders and instead screamed through the open flap and banged on the glass. Further, before the second and third application of chemical agents, Plaintiff was again repeatedly given opportunities to comply with verbal orders but refused. The entire incident was video recorded, the Warden was notified and authorized each application of chemical agents, and superior officers were present during the uses of chemical agents. Finally, considering how long Plaintiff continued to resist orders and displayed threatening and aggressive behavior, it was reasonable for staff to consider Plaintiff a threat to safety.

The undisputed evidence reveals no genuine issue of material fact concerning whether Defendant Lister's use of chemical agents was applied in a good faith effort to maintain or restore discipline. Lister ordered each use of force to quell Plaintiff's disruptive actions, including refusing to comply with

officers' orders and repeatedly yelling profanities at the officers, and did not do so for purposes of malicious or sadistic motives. Defendants' Motion is due to be granted on this claim.

### 3. Cell Extraction

Plaintiff claims that Defendants McCray and S. Williams used excessive physical force during their cell extraction, violating Plaintiff's Eighth Amendment rights. Doc. 1 at 20. Plaintiff alleges that Defendant McCray punched him in the face repeatedly and that Defendant S. Williams kicked him repeatedly in the face and body. Plaintiff claims that because of these Defendants' actions, he suffered serious physical injuries, including multiple abrasions on his back, swollen left ear, 3 cm x 0.5 cm laceration, head trauma, and permanent eye damage to his left eye requiring Plaintiff to now use eyeglasses to see. Id. at 25-26

Defendants McCray and S. Williams argue they are entitled to summary judgment on Plaintiff's excessive force claim because the evidence contradicts Plaintiff's version of events and shows there was a penological justification for the use of physical force. Doc. 63 at 12. They assert that Plaintiff refused all orders to cease his disruptive behavior and the force used was permissible to restore order and obtain compliance, and that the force used was not excessive in relation to the need for force. In his Response, Plaintiff argues that the "video evidence" shows Defendant McCray punching Plaintiff in the face

"repeatedly" and depicts Defendant S. Williams kicking Plaintiff "repeatedly" in the face and body. Doc. 74-1 at 10.

As mentioned above, the video evidence does not show the individual, specific movements of Plaintiff, McCray, or S. Williams once the cell extraction team breaches the shower cell. While there seems to be a physical struggle, no kicking or punching movements are seen. Rather, the only thing discernable from the recording is officers' repeated orders directing Plaintiff to "stop resisting," and banging noises from other inmates housed in the hallway.

In his Deposition, Plaintiff testified that while Defendant Carter was assembling the cell extraction team, Officer Lee approached Plaintiff and stated, "If you let the cell extraction team [in] -- they going to beat you up. They already talking about beating you up so just go ahead and submit to hand restraints." Doc. 63-13 at 11. Plaintiff then explained his actions before and during the cell extraction as follows:

> Q So you're saying that you wouldn't come out until you saw them coming, and then once you saw them coming, you tried to submit to hand restraints?
>
> A No. I wasn't going to come out first until I spoke to Officer Lee.
>
> . . . .
>
> [Q] Did you come out before the cell extraction team got there?
>
> A No. . . .

As I see them coming as they're entering the wing to come get me through the cell extraction, I stick my hands out the [flap] where they're supposed to put hand restraints on me at, so they can take me out the shower. . . .

So while I stick my hands out the shower, I'm telling them I'm cuffing up. You-all cuff me up. . . . Captain Jason Carter told me to stick my hands back inside the holding cell flap, that he is not going to cuff me up. Stick my hands back inside and turn around. So I turn around -- I was confused. I'm like why is they not cuffing me up? I'm trying to cuff up now. . . . And as I turn around, I got my hands in an upward motion. I'm like, why you-all not cuffing me up? And that when they pop the shower cell door.

Sergeant Anthony McCray hit me with a shield. As he hit me with a shield, I fell on the ground. I'm laying flat on the ground. I seen him pass the shield to somebody. He took the shield off me and passed it to somebody. As soon as he took the shield off of me, he just started punching me in the face. I feel all punches in the face. I feel -- I'm trying to cover up. I'm looking and I see Sergeant Williams -- Slater Williams kicking me. I got boot marks on me. They kicking me. They punching me all over my body numerous times. I lost count. I say between 25 times I was being kicked and punched.

Q Tell me who did what.

A Sergeant Anthony McCray was punching me in the face. That's why I got my laceration. That's how he [] bust my eye open. I had a deep cut on my eye. Slater Williams was kicking me in my body and towards the head area. I guess that's how I got my head trauma, and the left side of my head swollen and my ear swollen and all the contusions I had. I'm trying to cover up with my hand, so that's how I got the

contusion on my left hand. All my injuries came to the left side of my body because the right side of my body was covered by the wall of the shower. So they can't hit me on the right side of my body, like how they hit me on my left side of my body.

Q And what did Carter do?

A They started yelling for me to start resisting, start resisting. So I'm like start resisting. They trying -- I thought I was fixing to die. I was terrified, ma'am, to be honest with you. [] I mean, I was -- I was dizzy. I was bleeding and there's blood all over me. I had blood all over my body. My boxers was drenched in blood. I felt they was fixing to kill me. I seen it happen numerous times. They be saying start resisting. Jason Carter say start resisting. . . .

Q [] You said to start resisting. What were you doing?

A. I was laying on the floor trying to cover myself up from getting hit. They was punching me and kicking me in the my face. I mean [] what can I do? I'm on the ground laying flat with, like, three big officers all over me, kicking me and punching me. I mean [] what can I do?

Q [] Can you describe how you were lying flat?

A I was lying . . . on . . . my back.

Q On your back?

A. Yea. Like not flat on my back but, like my back arched where I can cover myself with my hand, like -- in, like a little ball, like -- like trying to ball up.

. . . .

Q Did you step back for them to enter?

39

A No. I just stand there. They popped the gate in. They popped the thing in. It's on video. I ain't step back at no time. I was trying . . . to let them put me in handcuffs so I could get out. That didn't work out. They just pop the cell and came in there. I ain't back up. I ain't did nothing. The force [fro]m the shield knocked me back. The shield hit me and knocked me back, why I fell all flat on the floor. That's what knocked me back.

. . . .

At first I was laying flat. When he moved the shield off me, I started balling up because he started punching me . . . .

And when I started balling up and kept trying to ball up [] that's when they kept kicking me and punching me - -

Q [D]escribe the position you were in when you balled up.

A I tried to get my knees up to my -- my elbows to the top from stop being hit, stop these kicks and punches by [] McCray and [S.] Williams. . . .

I tried to get as close to wall like . . . a mouse chased in a house . . . . I tried to get as close to . . . this wall as possible, the corner, and try to ball up as much as I can because the punches and kicks from [] McCray and [S.] Williams.

Doc. 63-13 at 11-15.

Applying the five excessive use of force factors to the conduct as depicted in the video evidence and Plaintiff's sworn testimony about his conduct during the cell extraction, the Court concludes that the undisputed evidence shows no

genuine issue of material fact and Defendants McCray and S. Williams are entitled to summary judgment. As to the extent of the injury, the video shows the left side of Plaintiff's face was bleeding following the cell extraction. Although Defendants do not provide record evidence about Plaintiff's injuries, medical records attached to Plaintiff's Motion for Summary Judgment show Plaintiff received a post-use-of-force exam during which Defendant Stormant documented that Plaintiff was alert, oriented, and responded to questions verbally following the cell extraction.[6] Doc. 58-2. He had a 3 cm x 0.5 cm laceration above his left eyebrow, multiple abrasions on his back, bruising to the left side of his head, and swelling to his left ear. Id. Defendant Stormant cleaned the laceration and applied steri-strips. Id. Medical records generated an hour later show that the laceration reopened and measured 3 cm in length, 1 cm in width, and 0.5 cm in depth. Doc. 58-2 at 9. Defendant Stormant documented that the laceration needed possible sutures. Id. Doctor Colombani then examined Plaintiff the next morning, during which Plaintiff was alert, oriented, and verbally responding to questions. Doc. 58-2 at 6. Doctor Colombani noted that the laceration measured 3 cm x 2 cm and sent Plaintiff to an outside hospital for treatment. Records from Shands Live Oak Hospital show Plaintiff was diagnosed with a facial laceration and a hand contusion,

_____

[6] In support of her Motion, Defendant Stormant filed several medical records documenting the medical treatment Plaintiff received following the uses of force.

treated with ibuprofen and an antibiotic, and discharged the same day. Doc. 58-2 at 13. Plaintiff also attaches to his Motion a record showing that in March 2018, five months after the cell extraction, Plaintiff was prescribed eyeglasses. Doc. 58-2 at 12. Although, Plaintiff's face laceration resulted in outside hospital treatment, in his Complaint, Plaintiff alleges that Defendants Carter and Stormant's failure to properly treat his injuries during his initial post-use-of-force evaluation caused the size of his laceration to increase, negating any claim that Plaintiff was sent to the hospital because of the cell extraction. And Plaintiff's medical records do not support his allegations of a severe head or eye injury as a result of the cell extraction.

Second, undisputed evidence shows that Plaintiff's refusal to comply with officers' orders, even after verbal counseling and use of chemical agents, required the need for physical force. Plaintiff alleges he tried to submit to hand restraints before the cell extraction team entered, however, the video evidence shows that when Defendant Carter summoned over an officer to apply handcuffs, Plaintiff withdrew his submission, turned around to face the cell extraction team, and raised his arms in the air while he jumped up and down in an aggressive manner. The need for force was amplified when Plaintiff, by his own admission, balled up his body upon being knocked to the ground. Although he testified that Defendant Carter yelled "start resisting," the video

evidence contradicts that statement as the officers repeatedly ordered that Plaintiff "stop resisting."

Third, the Court considers the relationship between the need for force and the amount of force used. Despite being met with physical resistance, the cell extraction team appeared calm and professional while trying to restrain Plaintiff. Although five officers participated in the cell extraction team, only three of those officers entered the shower cell to physically restrain Plaintiff. From the time the team entered the cell to the time Plaintiff was restrained and standing, a mere two minutes elapsed. After the officers handcuffed Plaintiff, they did not use any more physical force. See Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1356 (11th Cir. 2015) (finding no excessive force where "the officers did not apply any force after [the plaintiff] finally surrendered his hands to be cuffed," and distinguishing cases like Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002), where force was applied after "the plaintiff was already arrested and in handcuffs"). The officers also videotaped the entire cell extraction and its aftermath. And, importantly, the officers immediately took Plaintiff to receive a medical examination after the incident. See Cockrell, 510 F.3d at 1312. In short, there is no genuine dispute of fact concerning whether the officers were justified in using force or whether they used only the amount of force necessary to handcuff Plaintiff. The record

simply does not support an inference of wantonness in the infliction of pain. See Scott, 550 U.S. at 380; Brown, 813 F.2d at 1188.

Fourth, the Court considers efforts made to temper the severity of the forceful response. In doing so, the Court notes that officers made many attempts and used a series of techniques to gain Plaintiff's compliance before using physical force. Officers used verbal counseling, but Plaintiff continued to refuse orders and became increasingly disrespectful and aggressive. Based on Plaintiff's unrelenting misconduct, Warden Anderson was notified and superior officers were present. Indeed, only when chemical agents failed to disable Plaintiff's resistance and force his compliance did officers have to resort to physical force to restrain Plaintiff.

Finally, given how long Plaintiff continued to resist orders and his verbal aggression, it was reasonable for staff to consider Plaintiff a threat to safety. Defendants McCray and S. Williams, at a minimum, knew Plaintiff was still refusing orders after three applications of chemical agents. And upon approaching Plaintiff's cell, they saw Plaintiff with his arms in the air jumping up and down in preparation of the cell extraction team's entry. Then, Plaintiff, by his own admission, resisted their efforts to restrain him.

"Although [the Court] cannot pinpoint with precision the amount of force used by [Defendants], the fact that there was no more than minimal injury, that some amount of force was justified under the circumstances, and that the

force was used for a legitimate security purpose persuades [the Court] that the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a reliable inference of wantonness in the infliction of pain.'" Brown, 813 F.2d at 1189-90 (quoting Whitley, 475 U.S. at 322). Thus, focusing on "the core judicial inquiry" of "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Defendants McCray and S. Williams did not use force maliciously or sadistically, but instead to maintain and restore discipline. Hudson, 503 U.S. at 7.

In some excessive force cases, the parties' competing versions of events are enough to defeat summary judgment. While the videos do not show every move made by each Defendant or by Plaintiff, they do document the scenario sufficiently to give an objective view of what happened. The video also establishes Plaintiff's aggressive and belligerent actions, which contributed to the need for the force used against him and "obviously contradict" Plaintiff's contrary testimony. Pourmoghani-Esfahani, 625 F.3d at 1315. Even looking at the record in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff suffered a violation of his Eighth Amendment rights. Thus, the Court will grant Defendants' Motion as to this claim.

45

## 4. Failure to Intervene

Plaintiff also claims Defendants Lister and Carter acted deliberately indifferent when they failed to intervene during McCray and S. Williams's excessive use of force. Doc. 1 at 16-19. Since the Court finds that Defendants McCray's and S. Williams's use of physical force was reasonable, Plaintiff's failure to intervene claims against Defendants Lister and Carter must also fail. See, e.g., Mobley, 783 F.3d at 1357 ("[A] police officer has no duty to intervene in another officer's use of force when that use of force is not excessive."). Thus, Defendants' Motion is granted as to this claim.

## 5. Deliberate Indifference to Post-Use-of-Force Medical Needs

Plaintiff claims Defendant Carter acted deliberately indifferent to Plaintiff's serious medical needs following the use of physical force because during Plaintiff's post-use-of-force exam, Defendant Carter told Defendant Stormant to not provide Plaintiff with any more medical treatment as he "was not dying." Doc. 1 at 22. Defendant Carter argues he is entitled to summary judgment on this claim because Plaintiff has failed to provide evidence showing a constitutional violation. Doc. 63 at 16. He contends that Plaintiff's allegations are conclusory and without support. Id.

When asked how Defendant Carter interfered with his post-use-of-force medical treatment, Plaintiff testified at his Deposition to the following:

He told her if he not dying, I'm going to put him in the cell. He cut . . . her short. She was putting something on my eye around my laceration, which needed . . . stitches. But she didn't want to put the stitches because he would not let her. . . . .

. . . .

Q You're telling me that the nurse wanted to put stitches in your eye?

A Yeah. In my eye. She wanted to do . . . something with stitches. . . . [A]nd that's when he was like, oh, he not dying. I'm going to put him up. Like he wanted to get me out of the medical hall, Captain Jason Carter. For whatever reason, he wanted me to get out the medical hall . . . .

Q Okay. So she [] put the butterfly stitches on?

A Yeah . . . .

Q [D]id she say to you I want to give you stitches?

A She looked -- her body language looked like she wanted to give me some more medical attention.

. . . .

Q [H]er body language looked like she wanted to give you some more medical attention. What I need for you is to describe what that looked like.

A She kept putting stuff around my eye . . .  and cleaning up blood on me. I mean that's the only thing -- you know -- I mean, I don't know.

All I know is what he said -- Captain Jason Carter said what he said. She stopped . . . giving me all medical attention. They drag me back up out the room.

> Q What exactly did he say to make her stop giving you
> medical attention?
>
> A . . . He said he's not dying. He in here talking. I'm
> going to put him back in his cell.

Doc. 63-13 at 15-16. Plaintiff testified that soon after officers placed him in his cell, Plaintiff got up to use the bathroom, blacked out, and when he woke up, he was back in the medical evaluation room. Id. at 16.

It is undisputed that following the cell extraction, Defendant Carter immediately escorted Plaintiff to medical for treatment. Plaintiff admits that Defendant Stormant treated his laceration with a "butterfly stitch," and then Defendant Carter escorted him to his cell. His allegation that Stormant's "body language" suggested she wanted to provide additional treatment is insufficient to demonstrate that she in fact wanted to provide more treatment and Defendant Carter prevented her from doing so. Defendant Carter's alleged conduct does not rise to the level of a constitutional violation. As a result, Defendants' Motion is due to be granted as to this claim.[7]

## B. Defendant Stormant's Motion

Stormant argues she is entitled to summary judgment on Plaintiff's individual and official capacity claims against her because her conduct did not

---

[7] The Court discusses Plaintiff's post-use-of-force medical treatment at length in its analysis of Defendant Stormant's Motion, finding no constitutional violation related to his treatment.

amount to a constitutional violation. Doc. 62 at 9-17. She also argues that Plaintiff's request for declaratory relief is moot.[8] Id. at 19-22. In support of her Motion, Stormant filed these exhibits: Plaintiff's Deposition (Doc. 62-1); several of Plaintiff's medical records (Doc. 68-1); two video recordings (Docs. 62-3; 62-4); and her own sworn Declaration (Doc. 62-5). The Court summarizes the relevant record evidence.

In her Declaration, Stormant describes her interactions with Plaintiff:

> I am a currently a Registered Nurse ("RN"). On October 8, 2017, though, I was a Licensed Practical Nurse ("LPN") who was employed by Centurion of Florida, LLC at Hamilton Correctional Institution.
>
> . . . .
>
> On October 8, 2017, I was working in the confinement dorm's medical room (the "Medical Room") at Hamilton Correctional Institution. No other medical personnel were present.
>
> Early that evening, inmate Maximo Gomez [] was brought into the Medical Room, having declared a psychological emergency.
>
> Following an evaluation, Mr. Gomez was being escorted to a confinement cell when he laid down on the ground outside the Medical Room. Eventually, correctional officers carried Mr. Gomez away from the Medical Room.

---

[8] Because the Court finds no constitutional violations occurred, the Court need not address Defendant Stormant's arguments about Plaintiff's official capacity claim or request for declaratory relief.

At approximately 7:40 p.m., Mr. Gomez was brought back to the Medical Room for a post-use-of-force evaluation, at which time I took his vitals and checked his respirations since I was informed chemical agents had been used.

I evaluated Mr. Gomez in the Medical Room, as shown by Mr. Gomez's medical records. As part of my exam, I evaluated Mr. Gomez for concussion and other neurological trauma. This included giving Mr. Gomez a miniature, four-question neurological exam by asking him if he knew his name, where he was, the time, and his situation. Mr. Gomez was able to answer all questions without difficulty, as I later noted on the Emergency Room Record in the "Examination Summary" section as "A&Ox4," which stands for alert and oriented times four. Because Mr. Gomez appeared alert and oriented, there was no indication of a concussion or other brain injury requiring additional observation or treatment at an outside hospital.

In addition to checking for a concussion and neurological trauma, I also assessed Mr. Gomez for physical injuries. Mr. Gomez had a laceration above his left eye that measured 3 cm in length by .5 cm in width. I did not measure the depth of the laceration. Mr. Gomez also had bruising and swelling to the left side of his head and ear, and he had abrasions on his back.

The only physical injury that required treatment was the laceration above Mr. Gomez's left eye. I cleaned the laceration and applied an antibiotic ointment.

The Medical Room, though, was out of steri-strips to close the laceration, and I informed Captain Jason Carter that I needed to get those supplies from another area in the facility.

Capt. Carter then told me that Mr. Gomez would be taken to a confinement cell, and that I could finish treating Mr. Gomez after gathering the necessary supplies. Mr. Gomez was then taken from the Medical Room. In my experience, it is routine that when additional medical supplies are needed and an inmate is exhibiting behavioral issues, that the inmate is escorted to a cell while the medical supplies are obtained rather than being left in the medical room.

I gathered the necessary supplies, and then Mr. Gomez was brought back to the Medical Room. I then applied steri-strips to close the laceration and covered it with a bandage.

In my medical opinion, Mr. Gomez did not require further treatment at that time, and he voiced no additional complaints.

Capt. Carter never advised me to stop providing medical treatment to Mr. Gomez.

A[t] approximately 8 p.m., I called Dr. Leslie Colombani, the medical doctor for the facility, and informed him of the treatment provided to Mr. Gomez. I then completed the Emergency Room Record in Mr. Gomez's medical records.

At approximately 8:55 p.m., Mr. Gomez was brought back to the Medical Room, and the laceration above his left eye had reopened. I do not know how his laceration reopened, but I recall that the steri-strips and bandage I had applied earlier were no longer covering the wound. It is not uncommon for prisoners to reopen their previous injuries to get out of confinement for additional medical treatment.

I again measured the laceration, and this time I noted it was 3 cm in length, 1 cm wide, and .5 cm deep. I noted that the laceration may require sutures and again contacted Dr. Colombani. Dr. Colombani

advised I should bandage the laceration and that he would evaluate it in the morning to see if sutures were required. As an LPN, I am not permitted to suture a laceration.

I again cleaned the laceration and applied steri-strips. I then wrapped Mr. Gomez's head with a pressure dressing to prevent the laceration from reopening before the morning. I also provided Mr. Gomez was acetaminophen for pain.

Mr. Gomez was conscience and alert when he was brought back to the Medical Room.

I then completed the Abrasion/Laceration Protocol form in Mr. Gomez's medical records. Contrary to any claim otherwise, I did not indicate that Mr. Gomez's laceration reopened due to a second cell extraction. Instead, the form indicates that the laceration above Mr. Gomez's eye was caused during the earlier cell extraction, and then it reopened.

I did not provide any further treatment to Mr. Gomez after seeing him in the Medical Room on October 8, 2017, at 8:55 p.m. My shift ended before Dr. Colombani arrived the morning of October 9, 2017, and I never had a discussion with Dr. Colombani about Mr. Gomez in front of Mr. Gomez.

Although I did not provide additional treatment, I reviewed Mr. Gomez's medical records for October 9, 2017, during the course of this litigation. Medical records indicate that during an evaluation on October 9, at approximately 9:45 a.m., Mr. Gomez's laceration measured 3 cm long by 2 cm wide. The medical records indicate that Dr. Colombani sent Mr. Gomez for treatment at Shands Live Oak Hospital, and Mr. Gomez was discharged the same day.

Doc. 62-5 at 1-5.

Stormant also filed several medical documents under seal. According to a Post-Use-of-Force Report, Stormant conducted her initial medical evaluation of Plaintiff at 7:40 p.m. Doc. 68-1 at 7-8. Stormant noted that upon arrival, Plaintiff appeared alert, oriented, and responded to questions verbally. Id. at 7. Plaintiff complained of pain in his back and left shoulder, areas where Stormant noted abrasions were present. Stormant summarized the examination as follows:

> A&Ox4 Resp. even and unlabored but slightly increased. Skin warm and dry. Laceration noted to left eyebrow. Approx. 3cmx0.5cm. multiple abrasions noted to back. No other complaints voiced. Bruising noted to left side of head. Left ear swollen.

Id. Stormant documented her treatment, stating she notified Dr. Colombani about Plaintiff's injuries, "cleansed laceration, applied ABT ointment, and applied steri-strips covered with bandage." Id. Plaintiff tolerated treatment well and voiced no complaints.

Stormant also provides an "Abrasion/Laceration Protocol" form showing that at 8:55 p.m., Stormant conducted another medical exam of Plaintiff because his left eyebrow laceration reopened. Doc. 68-1 at 9. Stormant remeasured the laceration and documented its size as 3 cm in length, 1 cm in width, and 0.5 cm in depth. Id. The laceration had minimal bleeding, but Stormant noted that sutures may be necessary. Id. The document also indicates Stormant again cleaned the wound and bandaged it using "steri-

53

strips with pressure dressing," and provided Plaintiff acetaminophen. Id. at 10. Stormant contacted Dr. Colombani who stated, "he will suture in AM, [and] to bandage up for now." Id. Stormant documented that Plaintiff was advised to return to medical the next day for sutures. Id.

According to medical documents, Dr. Colombani examined Plaintiff the next morning, October 9, 2017, at 9:45 a.m., and noted that Plaintiff appeared alert, oriented, and responded to questions verbally. Doc. 68-1 at 13. Dr. Colombani summarized his examination, stating, "Pt. A[&]ox4. Resp. E & U. [] Skin w/d. 3 cm x 2 cm laceration to [left] eye. Bruising noted to [left] side of head, neck, under [left] side of chin. Swelling under [left] ear." Id. Dr. Colombani then sent Plaintiff to an outside hospital. Id.

Stormant provides evidence that Plaintiff was sent to Shands Live Oak Hospital for care. Doc. 68-1 at 17. According to the hospital's discharge instructions, hospital personnel diagnosed Plaintiff with "[c]ontusion of left hand; eyebrow/facial laceration with repair, no foreign body" and provided Plaintiff with pain medication and IV antibiotics. Id. The hospital discharged Plaintiff the same day and prescribed Ibuprofen and Keflex. Id.

Upon Plaintiff's return to Hamilton C.I., Plaintiff's "Chronological Record of Health Care" provides that on October 9, 2017:

> Pt returned from outside hospital [] A[&Ox4. Resp.
> E&U. Denies any c/o pain/discomfort at this time.
> Release to security for housing . . . .

54

> Pt. declined psych emergency. Pt stated "he did not
> want to go SHOS or hurt himself, he was just worried
> about his family because they knew of prior
> altercation." . . . . to be evaluated by psych tomorrow.
>
> . . . .

Doc. 68-1 at 27. Plaintiff's next encounter with medical occurred on October 14,

2017, when Plaintiff advised medical he "swallowed a sharp piece of metal . . .

." Id.

A review of handheld video evidence shows another angle of the cell

extraction team footage summarized in detail above.[9] Doc. 62-4. Although this

handheld footage shows a slightly different angle of the cell extraction, the

specific action of each extraction team member cannot be seen.

The video evidence shows that once Plaintiff is restrained, the cell

extraction team members and Defendant Carter escort Plaintiff to medical.

Once inside the evaluation room, the door is closed and the footage shows

Plaintiff through the door window. Defendant Stormant is seen looking at

Plaintiff's left eye and cleaning it. Plaintiff appears to be in pain, but he is

---

[9] Stormant filed, under seal, one disc containing two video recordings.
The first recording (Doc. 62-3) is the same handheld camera evidence depicting
Plaintiff's psychological evaluation, which was submitted by the other
Defendants and summarized above. The second recording (Doc. 62-4) is
handheld camera evidence depicting another angle of Plaintiff's cell extraction
and post-use-of-force evaluation.

conscious, alert, and speaking to Stormant inside the room. Plaintiff raises his voice and audibly accuses the officers of "beating him up" and one of the cell extraction team members in the room orders Plaintiff to "shut his mouth." Stormant is seen taking Plaintiff's blood pressure and examining his head and back.

About five minutes later, Defendant Carter opens the cell door and Plaintiff is escorted out of the room without incident. While being escorted, Plaintiff makes dramatic grunting noises and sometimes bends at the waist as if it is difficult for him to stand up straight to walk. Once in the cell, Plaintiff calmly sits on his bunk and officers close the cell door without incident. Defendant Carter then asks another officer, who is not seen on camera, to "maintain observation" of Plaintiff. Defendant Carter then walks back towards medical and addresses the camera. Carter explains that following the uses of force, Plaintiff was seen by medical and placed in a cell for observation but "will be removed again for further medical treatment." The video then ends at 7:45 p.m.

### 1. Deliberate Indifference to Post-Use-of-Force Medical Needs

Stormant argues she is entitled to summary judgment for five reasons: (1) constitutionally adequate medical care was provided; (2) no evidence of objectively serious medical need or subjective disregard relating to claims of eye damage or neurological injury; (3) no evidence more medical treatment was

required; (4) no expert medical testimony Defendant Stormant was deliberately indifferent; and (5) Plaintiff cannot demonstrate causation. See generally Doc. 62.

In his Response, Plaintiff alleges Stormant acted deliberately indifferent because she "knew Plaintiff had a serious medical need (head trauma)," and she "failed to respond reasonably" to that serious medical need. Doc. 66 at 1-2. He contends that his condition was "very obvious," and because of Stormant's deliberate indifference, the size of his facial laceration grew from 3 cm x 0.5 cm to 3 cm x 2 cm. Id. at 2. He maintains that "video evidence" shows he was placed back into his cell without the proper medical treatment and was later found unconscious and covered in blood. Id. at 3 He asserts Dr. Colombani advised Stormant that she should not have placed Plaintiff back in his cell with such severe injuries, and that Stormant falsified the second medical evaluation document indicating he received more medical treatment at 8:55 p.m. Id. at 3-4.

Even if Plaintiff established that he suffered a serious medical need, he has failed to show that Defendant Stormant acted deliberately indifferent to that medical need. During the post-use-of-force evaluation, conducted immediately following the cell extraction, Stormant evaluated Plaintiff for any neurological injury and found he was not exhibiting signs of such ailments. Indeed, the video evidence shows Plaintiff appeared alert, conscious, and

responsive during the evaluation. Stormant also examined Plaintiff's face laceration, cleaned the wound, and applied steri-strips to close it. She documented his other physical injuries and took Plaintiff's vitals.

When Plaintiff's laceration reopened, Stormant again evaluated Plaintiff for any neurological injury and found that Plaintiff was alert, conscious, and responsive to questions. She noted that the laceration had grown in size, and she contacted Dr. Colombani who advised her Plaintiff may need sutures and that he would examine Plaintiff in the morning. Stormant then cleaned the wound again and reapplied steri-strips and a pressure dressing. Plaintiff does not dispute that Stormant, at that time, was unqualified to stitch his wound, and thus it is unclear what other medical treatment Stormant could have provided Plaintiff.

Also, after Stormant's two medical evaluations indicating Plaintiff's facial laceration was the only injury requiring treatment, two other medical personnel (Dr. Colombani and Shands Live Oak) examined Plaintiff and neither of those additional evaluations indicated Plaintiff suffered injuries that Stormant did not document. Indeed, documentation of Dr. Colombani's medical evaluation conducted the next morning, contains essentially the same examination summary and lists the same injuries as those documented by Stormant. Dr. Colombani also noted Plaintiff was still alert, oriented, and responsive. Likewise, hospital records from Shands Live Oak list the only head

58

injury as "eyebrow/facial laceration with repair." Notably, no medical record from either October 8 or October 9 indicates Plaintiff suffered a severe eye or brain injury. And while Plaintiff argues that Stormant falsified the medical documentation of his second medical evaluation at 8:55 p.m., he offers no evidence to support that allegation.

In sum, Plaintiff fails to establish Stormant knew Plaintiff had additional injuries serious enough to necessitate more treatment than that which she provided, but intentionally ignored those injuries and refused to provide such treatment. Indeed, the record contains no facts permitting a reasonable inference that Defendant Stormant "acted with a state of mind that constituted deliberate indifference," Richardson, 598 F.3d at 737, or that her physical examination and treatment of Plaintiff was "so grossly incompetent, inadequate, or excessive as to shock the conscience," Harris, 941 F.2d at 1495. Thus, Defendant Stormant's Motion is due to be granted.

### C. Plaintiff's Motion

In his Motion, Plaintiff argues he is entitled to summary judgment "on ALL claims," including "excessive use of force, failure to [intervene], and deliberate indifference to a serious medical need 'after' post use of force." Doc. 58 at 1-3. Largely relying on the allegations as alleged in his Complaint, Plaintiff argues there are no genuine issues of material fact as to Defendants' constitutional violations. See id. He attaches several exhibits, including his

59

administrative grievances (Doc. 58-1 at 1-12); his medical records (Doc. 58-2); and use of force incident reports (Doc. 58-3).[10] Plaintiff also attaches an Affidavit containing statements seemingly identical to those alleged in his Complaint. Doc. 58-1 at 13-24. Because the Court has found that Defendants are entitled to judgment in their favor, Plaintiff's Motion for Summary Judgment as to the claims against them necessarily must fail.

Therefore, it is now

**ORDERED AND ADJUDGED**:

1. Plaintiff's Motion for Summary Judgment (Doc. 58) is **DENIED**.

2. Defendant Stormant's Motion for Summary Judgment (Doc. 62) is **GRANTED**.

3. Defendants McCray, Carter, S. Williams, and Lister's Motion for Summary Judgment (Doc. 63) is **GRANTED**.

---

[10] The incident reports Plaintiff provides are the same incident reports provided by Defendants McCray, Carter, S. Williams, and Lister in support of their Motion. See Doc. 63-5 at 1-35. Most of the medical records Plaintiff provides are also filed by Defendant Stormant.

4.    The Clerk is directed to enter judgment in favor of Defendants Stormant, McCray, Carter, S. Williams, and Lister and against Plaintiff; terminate any pending motions; and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 22nd day of February, 2022.

_____
BRIAN J. DAVIS
United States District Judge

Jax-7
C:    Gomez Maximo, #M11644
        Counsel of record

61